## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VICTOR G. PEREZ, individually and as Assignee of PINATA GRAPHICS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:08-cv-04364 |
| AMCO INSURANCE COMPANY, NATIONWIDE PROPERTY & CASUALTY INSURANCE COMPANY, and ALLIED PROPERTY & CASUALTY INSURANCE COMPANY, | ) ) ) ) ) | Judge Robert M. Dow, Jr. Magistrate Judge Morton Denlow |
| Defendants. | ) ) | |

### AMCO INSURANCE COMPANY'S
### ANSWER AND DEFENSES TO PLAINTIFFS' COMPLAINT

Now comes the Defendant, AMCO Insurance Company ("AMCO"), by and through its attorneys, John D. Hackett and Jamie L. Hull of Cassiday Schade LLP, and for its Answer to Plaintiffs' Complaint, states as follows:

### PARTIES

1.     At all times relevant, PINATA GRAPHICS, INC. ("Pinata") was an Illinois corporation, organized and existing pursuant to the laws of the state of Illinois.

**ANSWER:**     AMCO admits the allegations contained in paragraph 1.

2.     VICTOR G. PEREZ ("Perez") is a natural person who resides and does business in Cook County.  Perez was, at all times relevant, the president and sole shareholder of Pinata.

**ANSWER:**     AMCO admits the allegations contained in paragraph 2.

3.    At all times relevant, Pinata was in the business of commercial printing, and operated a commercial printing press from its business located at 3604-3212 S. Iron Street, Chicago, Illinois.

**ANSWER:**    AMCO admits the allegations contained in paragraph 3.

4.    AMCO INSURANCE COMPANY ("AMCO") is an insurance company which issued a policy or policies of commercial property insurance which covered property owned by Pinata and located at 3604-3612 S. Iron Street, Chicago, Illinois.

**ANSWER:**    AMCO admits that it issued its Premier Businessowners Policy No. ACP BPS 7101686319 to Pinata located at 3604-3612 Iron Street in Chicago, Illinois, for the policy period of December 20, 2004 to December 20, 2005.  The policy was renewed for 2005-2006 under Policy No. ACP BPS 7111686319.  AMCO states that the policies are in writing and speak for themselves.

5.    NATIONWIDE PROPERTY & CASUALTY INSURANCE COMPANY ("Nationwide") is an insurance company which does business in Cook County, Illinois.  Nationwide and AMCO are affiliated companies.  Nationwide provides claims adjustment services for claims brought by policyholders of AMCO.

**ANSWER:**    AMCO admits that Nationwide Property & Casualty Insurance Company is an affiliated company of Nationwide® which does business in Cook County, Illinois.  AMCO denies that Nationwide is a properly named defendant to this lawsuit.  AMCO further denies that Nationwide provides claims adjustment services for claims brought by policyholders of AMCO.

6.    ALLIED PROPERTY & CASUALTY INSURANCE CO. ("Allied") is an insurance company which does business in Cook County, Illinois.   Allied is affiliated with

Nationwide and AMCO.   Allied provides claims adjustment services for claims brought by policyholders of AMCO.

**ANSWER:**   AMCO admits that Allied Insurance is an affiliated company and responsible for the independent agency system of Nationwide®.  Both AMCO and Allied Property & Casualty Insurance Co. are Allied Insurance companies and do business in Cook County, Illinois.  AMCO denies that Allied Property & Casualty Insurance Co. is a properly named defendant to this lawsuit.  AMCO further denies that Allied Property & Casualty Insurance Co. provided claims adjustment services for AMCO in connection with this matter.

### INSURANCE POLICIES

7.     AMCO issued policy number ACP-BPS-7101686319 effective December 20, 2004 to December 20, 2005 (the "AMCO policy").  A certified copy of the AMCO policy is attached as exhibit "1".

**ANSWER:**     AMCO admits the allegations contained in paragraph 7.

8.     The Named Insured shown on the AMCO policy's Common Declarations is:

PINATA GRAPHICS, INC.
PEREZ, VICTOR – INDIVIDUAL

**ANSWER:**     AMCO admits the allegations contained in paragraph 8.

9.     The AMCO policy was renewed under policy number ACP-BPS-7111686319 effective December 20, 2005 to December 20, 2006 (the "AMCO renewal policy").  A certified copy of the AMCO renewal policy is attached as exhibit "2."

**ANSWER:**     AMCO admits the allegations contained in paragraph 9.

10.     The Named Insured shown on the AMCO renewal policy is:

PINATA GRAPHICS, INC.
PEREZ, VICTOR – INDIVIDUAL

**ANSWER:**    AMCO admits that the Schedule of Named Insureds to the AMCO renewal policy lists both Pinata Graphics, Inc. and Peres, Victor – Individual as named insureds.

11.    Subject to their terms and conditions, the AMCO policy and the AMCO renewal policy covered property described in the policy Declarations.

**ANSWER:**    To the extent that the allegations contained in paragraph 11 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO states that the AMCO policy and the AMCO renewal policy are in writing and speak for themselves, and AMCO denies any allegations in paragraph 11 inconsistent therewith.

12.    The property described in the Declarations of the AMCO policy and the AMCO renewal policy is 3604 – 3612 Iron Street, Chicago, Illinois.

**ANSWER:**    AMCO admits that the Property Declarations to the AMCO policy and the AMCO renewal policy state the Premises Address as 3604 – 3612 S. Iron St., Chicago, IL.

13.    Policy limits under the AMCO policy, as shown in the policy Declarations, are:

**COVERAGES**

| | |
|---|---|
| Building – Replacement cost | $1,150,100.00 |
| Business Personal Property – Replacement cost | $2,107,800.00 |

**ADDITIONAL COVERAGES …**

| | |
|---|---|
| Business Income … | INCLUDED |
| Extra Expense … | INCLUDED |
| Equipment Breakdown | INCLUDED |

4

**ANSWER:**    AMCO states that the terms, coverages, conditions, exclusions, definitions and endorsements of the AMCO policy speak for themselves, and therefore, denies the allegations contained in paragraph 13 to the extent that they are inconsistent or give an inaccurate portrayal of said terms, coverages, conditions, exclusions, definitions or endorsements.

14.    Policy limits under the AMCO renewal policy, as shown in the policy Declarations, are:

### COVERAGES

| | |
|---|---|
| Building – Replacement cost | $1,196,200.00 |
| Business Personal Property- Replacement cost | $2,169,000.00 |

### ADDITIONAL COVERAGES …

| | |
|---|---|
| Business Income … | INCLUDED |
| Extra Expense … | INCLUDED |
| Equipment Breakdown | INCLUDED |

**ANSWER:**    AMCO states that the terms, coverages, conditions, exclusions, definitions and endorsements of the AMCO renewal policy speak for themselves, and therefore, denies the allegations contained in paragraph 14 to the extent that they are inconsistent or give an inaccurate portrayal of said terms, coverages, conditions, exclusions, definitions or endorsements.

15.    The insuring agreement of the AMCO policy and AMCO renewal policy states, in relevant part, as follows:

A.    **COVERAGES**

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

5

1.     **COVERED PROPERTY**

Covered Property, as used in this policy, means Buildings and Business Personal Property as described in paragraphs a. and b. in this Section A.1., if a Limit of Insurance is shown in the Declarations for that type of property.

\* \* \*

    a.     **Buildings**, meaning the buildings and structures at the premises described in the Declarations, including: \* \* \*

        2)     Fixtures, …

        3)     Permanently installed:

            a)     Machinery;

            b)     Equipment; and \* \* \*

    b.     **Business Personal Property** located in or on the buildings at the described premises …, consisting of the following:

        1)     Personal property you own that is used in your business, including but not limited to furniture, fixtures, machinery, equipment and "stock";

\* \* \*

3.     **COVERED CAUSES OF LOSS**

This Coverage Form insures against Risks of Direct Physical Loss unless the loss is:

    a.     Excluded … [or]

    b.     Limited, …

\* \* \*

5.     **ADDITIONAL COVERAGES**

6

\* \* \*

g.    **Business Income**

1)    **Business Income With Ordinary Payroll Limitation**

a.    We will pay for the actual loss of "business income" you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. \* \* \*

c.    We will only pay for loss of "business income" that you sustain during the "period of restoration" and that occurs within 12 consecutive months after the date of direct physical loss or damage. We will only pay for "ordinary payroll expenses" for 60 days following the date of direct physical loss or damage.

2)    **Extended Business Income**

a)    If the necessary suspension of your "operations" produces a "business income" loss payable under this policy, we will pay for the actual loss of "business income" you incur during the period that:

i)    Begins on the date property except finished stock is actually repaired, rebuilt or replaced and "operations" are resumed; and

ii)    Ends on the earlier of:

i.    The date you could restore your "operations" with reasonable speed, to the level which would generate the

7

"business income" amount that would have existed if no direct physical loss or damage had occurred; or

ii.    Sixty (60) consecutive days after the date determined in 2)a)i) above.

\* \* \*

b)    Loss of "business income" must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

3)    This Business Income Additional Coverage is not subject to the Limits of Insurance.

**h.    Extra Expense**

1)    We will pay necessary "extra expense" you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property at the described premises. The loss or damage just be caused by or result from a Covered Cause of Loss. \* \* \*

3)    We will only pay for "extra expense" that occurs within 12 consecutive months after the date of direct physical loss or damage.

4)    This Extra Expense Additional Coverage is not subject to the Limits of Insurance.

\* \* \*

**o.    Equipment Breakdown**

1)    We will pay for loss caused by or resulting from an "accident" to covered equipment.  \* \* \*

**ANSWER:**    AMCO states that the terms, coverages, conditions, exclusions, definitions and endorsements of the AMCO policies speak for themselves, and therefore, denies the allegations contained in paragraph 15 to the extent that they are inconsistent or give an inaccurate portrayal of said terms, coverages, conditions, exclusions, definitions or endorsements.

16.    The policy defines certain terms, including:

1.    **"Accident"** means direct physical loss as follows: a. Mechanical breakdown,

**ANSWER:**    AMCO states that the terms, coverages, conditions, exclusions, definitions and endorsements of the AMCO policies speak for themselves, and therefore, denies the allegations contained in paragraph 16 to the extent that they are inconsistent or give an inaccurate portrayal of said terms, coverages, conditions, exclusions, definitions or endorsements.

### PINATA'S RYOBI PRINTING PRESS

17.    In 2001, Pinata acquired a Ryobi Five Stage Printing Press, more specifically described as a Ryobi 685 XL S/N 1084 with Aqueous/U.V. Coater System ("Ryobi Press").  The purchase price was $1,599,429.00.

**ANSWER:**    AMCO admits the allegations contained in paragraph 17.

18.    In 2001, the Ryobi Press was installed at Pinata's place of business at 3604 S. Iron Street, Chicago, Illinois, and at all times relevant was operated by Pinata at that location.

**ANSWER:**    AMCO admits the allegations contained in paragraph 18.

19.    The Ryobi Press that Pinata acquired in 2001 was state of the art equipment, which gave Pinata a competitive advantage in the commercial printing industry.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 19 and, therefore, denies the same and demands strict proof thereof.

20.    Pinata operated the Ryobi Press successfully from 2001 until the Ryobi Press sustained a cracked frame in 2005. Pinata's business income grew and continued to grow from 2001 until an accident which occurred in 2005.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in paragraph 20, and therefore, denies the same and demands strict proof thereof.

## THE CRACKED FRAME PROPERTY LOSS

21.    In 2005, the Ryobi Press sustained a cracked frame as the result of an "accident" as defined in the AMCO policy and AMCO renewal policy ("cracked frame property loss").

**ANSWER:**    AMCO admits the allegations contained in paragraph 21.

22.    On or about November 24, 2005, Perez discovered that the Ryobi Press had sustained a cracked frame. On or about that date notice of the cracked frame property loss was given to AMCO.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 22 and, therefore, denies the same and demands strict proof thereof. Answering further, AMCO denies that notice of the cracked frame property loss was given to AMCO on or about November 24, 2005.

23.    AMCO gave notice of the cracked frame property loss to Nationwide and Allied. AMCO and/or Nationwide and/or Allied retained adjusters, investigators and accountants to

investigate the damage to the Ryobi Press and the loss of business income sustained as a result of the cracked frame property loss.

       **<u>ANSWER:</u>**    AMCO denies the allegations contained in paragraph 23.

       24.     AMCO and/or Nationwide and/or Allied gave notice of the cracked frame property loss to Hartford Steam Boiler Inspection and Insurance Company ("Hartford").

       **<u>ANSWER:</u>**    AMCO admits that it gave notice of the cracked frame property loss to Hartford Steam Boiler Inspection and Insurance Company, but denies that Nationwide or Allied gave such notice.

       25.     On information and belief, plaintiffs allege that AMCO reinsured through Hartford the risk of loss caused by accidental equipment breakdown.

       **<u>ANSWER:</u>**    AMCO admits that it reinsured equipment breakdown coverage through Hartford Steam Boiler Inspection and Insurance Company.

       26.     Neither Pinata nor Perez had any contractual relationship with Hartford.

       **<u>ANSWER:</u>**    To the extent that the allegations contained in paragraph 26 state a legal conclusion, no answer is required.

       27.     Hartford retained adjusters, investigators and accountants to investigate the damage to the Ryobi Press and the loss of business income sustained as a result of the cracked frame property loss.

       **<u>ANSWER:</u>**    AMCO admits the allegations contained in paragraph 27.

       28.     Hartford provided claims adjustment services for the cracked frame property loss pursuant to the terms and conditions of the AMCO policy.  At all times relevant, Hartford acted as

agent of AMCO and/or Nationwide and/or Allied with respect to the claim adjustment of the cracked frame property loss.

**ANSWER:**    AMCO admits that Hartford adjusted the claim for the cracked frame property loss.   To the extent the remaining allegations contained in paragraph 28 state a legal conclusion, no answer is required.   To the extent that an answer is required, AMCO denies the remaining allegations contained in paragraph 28.

29.    Hartford retained Louis A. Benbow to investigate and supervise repair of the Ryobi Press.   At all times relevant, Mr. Benbow served as agent of Hartford with respect to the investigation and supervision of repair of the Ryobi Press.

**ANSWER:**    AMCO admits that Hartford retained Louis A. Benbow to investigate and supervise repair of the Ryobi Press.  To the extent the remaining allegations contained in paragraph 29 state a legal conclusion, no answer is required.  To the extent an answer is required, AMCO states that it lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 29 and, therefore, denies the same and demands strict proof thereof.

30.    At all times relevant, Mr. Benbow served as sub-agent of AMCO and/or Nationwide and/or Allied with respect to the investigation and supervision of repair of the Ryobi Press.

**ANSWER:**    To the extent the allegations contained in paragraph 30 state a legal conclusion, no answer is required.   To the extent that an answer is required, AMCO denies the allegations contained in paragraph 30.

31.     Mr. Benbow presented himself to Pinata and Perez as a Printing Machinery Consultant, with special expertise in the field of printing press equipment breakdown and property losses with the authority of Pinata's insurers to investigate and supervise repair of the Ryobi Press.

**ANSWER:**     AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 31 and, therefore, denies the same and demands strict proof thereof.

32.     On or about December 27, 2005, Pinata obtained repair proposals from the Ryobi Press Manufacturer ("Ryobi") and manufacturer's representative ("American Pro Tec") for temporary and permanent repair of the Ryobi Press.  Ryobi and American Pro Tec recommended temporary repairs at a cost of $10,800.00 to place the Ryobi Press back into service temporarily, and permanent repair at a cost of $249,980.00 to repair the cracked frame.

**ANSWER:**     AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 32 and, therefore, denies the same and demands strict proof thereof.

33.     On or about December 27, 2005, AMCO and/or Nationwide and/or Allied by and through their sub-agent, Louis A. Benbow, assumed control over the repair of the Ryobi Press. Specifically, and without limitation, AMCO and/or Nationwide and/or Allied by their sub-agent Mr. Benbow assumed control over the repair operations in one or more of the following aspects:

    a.     AMCO and/or Nationwide and/or Allied required Mr. Benbow's approval for repair proposals submitted by Ryobi and American Pro Tec.

b.  On one or more occasions, AMCO and/or Nationwide and/or Allied, by and through their sub-agent Mr. Benbow, refused consent to permanent repair procedures recommended by Ryobi and American Pro Tec.

c.  On or about December 27, 2005, AMCO and/or Nationwide and/or Allied by and through their sub-agent Mr. Benbow, authorized the temporary repairs recommended by Ryobi and American Pro Tec.

d.  On or about December 27, 2005, AMCO and/or Nationwide and/or Allied, by and through their sub-agent Mr. Benbow, refused authorization for the permanent repairs recommended by Ryobi and American Pro Tec.

e.  After temporary repairs were performed in January, 2006, AMCO and/or Nationwide and/or Allied by and through their sub-agent Mr. Benbow, required continuing adjustments and testing of the Ryobi Press, contrary to the recommendations of Ryobi and American Pro Tec.

**ANSWER:**   To the extent the allegations contained in paragraph 33 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO denies the allegations contained in paragraph 33.

34.   The temporary repairs recommended by Ryobi and American Pro Tec were performed in January, 2006, and the Ryobi Press was placed back into temporary service at that time.

**ANSWER:**   AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 34 and, therefore, denies the same and demands strict proof thereof.

14

35.     After the temporary repairs were completed, use and operation of the Ryobi Press was subject to periodic interruptions and slowdowns, due to the fact that the cracked frame had not been repaired, which caused a further loss of Pinata's business income.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 35 and, therefore, denies the same and demands strict proof thereof.

36.     Throughout the months of January through July, 2006, American Pro Tec continued to recommend performance of the permanent repairs originally recommended by Ryobi and American Pro Tec, to fix the cracked frame and stop the periodic interruptions and slowdowns in operation of the Ryobi Press.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 36 and, therefore, denies the same and demands strict proof thereof.

37.     Pursuant to the recommendations of Ryobi and American Pro Tec, Pinata and Perez requested that AMCO and/or Nationwide and/or Allied authorize the permanent repairs to the Ryobi Press recommended by Ryobi and American Pro Tec, and AMCO and/or Nationwide and/or Allied, on the recommendation of Mr. Benbow, refused to authorize the permanent repairs.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 37 and, therefore, denies the same and demands strict proof thereof.

38.     In an attempt to stop the periodic interruptions and slowdowns, Mr. Benbow authorized adjustments to the Ryobi Press, and required further testing of the Ryobi Press to determine the extent of the damage.

**ANSWER:**     AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 38 and, therefore, denies the same and demands strict proof thereof.

39.     On or about June 19, 2006, American Pro Tec recommended against further use of the Ryobi Press with only the temporary repairs in place, because the repairs were not intended as a permanent fix, and were not reliable for permanent operation of the Ryobi Press.

**ANSWER:**     AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 39 and, therefore, denies the same and demands strict proof thereof.

40.     On or about June 19, 2006, Pinata and Perez again asked AMCO and/or Nationwide and/or Allied to authorize permanent repairs to the Ryobi Press recommended by Ryobi and American Pro Tec, and AMCO and/or Nationwide and/or Allied, on the recommendation of Mr. Benbow, again refused.

**ANSWER:**     AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 40 and, therefore, denies the same and demands strict proof thereof.

41.     On or about June 19, 2006, AMCO and/or Nationwide and/or Allied, by Mr. Benbow authorized only further adjustments, further testing, and continued use and operation of the Ryobi Press.  AMCO and/or Nationwide and/or Allied, through their agent Hartford, informed

Pinata and Perez that if American Pro Tec was unwilling to perform the adjustments and testing specified by Mr. Benbow, then Mr. Benbow would refer Pinata and Perez to other contractors willing to perform the adjustments and testing specified by Mr. Benbow.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding the recommendations and advisements of Mr. Benbow and regarding what Hartford informed Pinata and Perez concerning American Pro Tech's performance contained in paragraph 41 and, therefore, denies the same and demands strict proof thereof. To the extent the remaining allegations contained in paragraph 41 state a legal conclusion, no answer is required. To the extent that an answer is required, AMCO denies the remaining allegations contained in paragraph 41.

42.    On or about June 19, 2006, the adjustments and further testing of the Ryobi Press authorized by AMCO and/or Nationwide and/or Allied by and through their sub-agent Mr. Benbow were performed by American Pro Tec.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 42 regarding the adjustments and further testing of the Ryobi press and, therefore, denies the same and demands strict proof thereof. To the extent the remaining allegations contained in paragraph 42 state a legal conclusion, no answer is required. To the extent that an answer is required, AMCO denies the remaining allegations contained in paragraph 42.

43.    Further use and operation of the Ryobi Press authorized by AMCO and/or Nationwide and/or Allied, by and through their sub-agent Mr. Benbow resulted in further

interruptions and slowdowns, including interruptions and slowdowns caused by sheets of paper pulled into the drying/curing system of the Ryobi Press.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 43 regarding the further use and operation of the Ryobi press and, therefore, denies the same and demands strict proof thereof.  To the extent the remaining allegations contained in paragraph 43 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO denies the remaining allegations contained in paragraph 43.

## THE FIRE LOSS

44.    On or about July 22, 2006, a fire occurred inside the Ryobi Press, as a result of paper which had become trapped in the drying/curing system of the machine during use and operation authorized by AMCO and/or Nationwide and/or Allied by and through their sub-agent Mr. Benbow ("the fire loss").

**ANSWER:**    AMCO admits that a fire occurred in the Ryobi Press on or about July 22, 2006 as a result of paper falling onto the UV grid located within the printing press.  To the extent the remaining allegations contained in paragraph 44 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO denies the remaining allegations contained in paragraph 44.

45.    On or about July 22, 2006, notice of the fire loss was given to AMCO which in turn gave notice to Nationwide and Allied.

**ANSWER:**    AMCO denies the allegations contained in paragraph 45.

46.     On information and belief, AMCO did not reinsure the risk of loss caused by fire to property insured under the AMCO policy and AMCO renewal policy.

**ANSWER:**     AMCO admits the allegations contained in paragraph 46.

47.     Hartford did not participate in the adjustment of the fire loss claim.

**ANSWER:**     AMCO admits the allegations contained in paragraph 47.

48.     AMCO and/or Nationwide and/or Allied retained adjusters, investigators and accountants to investigate the damage to the Ryobi Press and the loss of business income sustained as a result of the fire loss.

**ANSWER:**     AMCO admits that it retained adjusters, investigators and accountants to investigate the damage to the Ryobi Press and the loss of business income sustained as a result of the fire loss, but denies that Nationwide or Allied did the same.

**REPAIR OF THE CRACKED FRAME**

49.     On or about October 16, 2006, AMCO and/or Nationwide and/or Allied, by and through their agent Hartford, authorized the permanent repairs to the Ryobi Press that had been recommended by Ryobi and American Pro Tec on December 27, 2005.

**ANSWER:**     AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations regarding the authorization of the permanent repairs to the Ryobi Press, and therefore, and, therefore, denies the same and demands strict proof thereof.  To the extent the remaining allegations contained in paragraph 49 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO denies the remaining allegations contained in paragraph 49.

50.    Permanent repair of the cracked frame was performed by American Pro Tec, at a cost of approximately $249,980.00, which was paid by AMCO, subject to a deductible of $1,000.

**ANSWER:**    AMCO admits the allegations contained in paragraph 50.

## REPAIR OF THE FIRE DAMAGE

51.    On or about November 14, 2006, American Pro Tec recommended repair of the fire damage sustained by the Ryobi Press in the amount of $65,457.09.

**ANSWER:**    AMCO admits the allegations contained in paragraph 51.

52.    AMCO and/or Nationwide and/or Allied authorized repair of the fire damage in the amount of $65,457.09.

**ANSWER:**    AMCO admits that it authorized repair of the fire damage in the amount of $65,457.09, but denies that Nationwide or Allied did the same.

53.    On or about January 21, 2007, AMCO paid the sum of $65,457.09, less the $1,000 deductible, for repair of the fire damage caused by the fire which occurred on July 22, 2006.

**ANSWER:**    AMCO admits the allegations contained in paragraph 53.

54.    American Pro Tec performed the repair work recommended, which was completed on or about April 30, 2007.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 54 and, therefore, denies the same and demands strict proof thereof.

## PINATA'S LOSS OF BUSINESS INCOME CLAIM

55.    On or about September 13, 2006, AMCO and/or Nationwide and/or Allied retained accountants Meaden & Moore to examine Pinata's claim for loss of business income and extra expense.

**ANSWER:**    AMCO admits that it retained Meaden & Moore to examine Pinata's claim for loss of business income and extra expense, but denies that Nationwide and Allied did the same.

56.    After September 13, 2006, Pinata produced documents requested by Meaden & Moore, including financial statements, profit and loss statements, tax returns and other financial records detailing the loss of business income caused by the cracked frame property loss and fire loss.

**ANSWER:**    AMCO admits that Pinata produced certain documents requested by Meaden & Moore in connection with their investigation of the business income loss claim, but denies that the documents produced were complete or sufficient, or that Pinata produced all of the documents requested by Meaden & Moore.

57.    On or about December 22, 2006, Pinata submitted a claim for loss of business income and extra expense caused by the cracked frame property loss and the fire loss.

**ANSWER:**    AMCO admits that on December 22, 2006, Pinata's attorney wrote to Hartford and to AMCO's independent adjuster, Dave Diedrich, regarding the calculations supporting Pinata's claim for loss of business income and extra expense.

58.    With respect to the cracked frame property loss, Pinata submitted a claim for $2,336,535.75 which included: (1) $271,410.55 in extra expense; (2) $982,735.68 in necessary continuing normal operating expenses incurred while operations were suspended; and (3)

$1,082,389.52 in net income that would have been earned if no physical loss or damage had occurred.

**ANSWER:**    AMCO admits the allegations contained in paragraph 58.

59.    With respect to the fire loss, Pinata submitted a claim on December 22, 2006 for loss of business income sustained through November 30, 2006, and extra expense in the amount of $832,323.78 which included: (1) $51,259.68 in extra expense; (2) $240,532.34 in necessary continuing normal operating expenses incurred while operations were suspended; and (3) $540,531.76 in net income that would have been earned if no physical loss or damage had occurred.

**ANSWER:**    AMCO admits the allegations contained in paragraph 59.

60.    On or about January 25, 2007, AMCO and/or Nationwide and/or Allied made an advance payment to Pinata of $25,000.00 for extra expense caused by the fire loss.

**ANSWER:**    AMCO admits that it made a $25,000 advance payment for extra expense caused by the fire loss on or about January 25, 2007, but denies that Nationwide or Allied did so.

61.    On or about February 8, 2007, AMCO and/or Nationwide and/or Allied made an advance payment to Pinata of $77,500.00 for loss of business income caused by the fire.

**ANSWER:**    AMCO admits that it made a $77,500 advanced payment for loss of business income caused by the fire on or about February 8, 2007, but denies that Nationwide or Allied did so.

62.    On or about February 16, 2007, AMCO and/or Nationwide and/or Allied made an additional advance payment to Pinata of $25,000.00 for loss of business income caused by the fire.

**ANSWER:**    AMCO admits that it made an additional $25,000 advance payment for loss of business income caused by the fire on or about February 16, 2007, but denies that Nationwide or Allied did so.

63.    On or about June 8, 2007, Meaden & Moore produced a document entitled: *Pinata Graphics – Incidents of 11/24/05 and 7/22/06 – Claimed v. Calculated by Category and Incident – Preliminary & Tentative – For Analysis Purposes Only*.

**ANSWER:**    AMCO admits the allegations contained in paragraph 63.

64.    It was Meaden & Moore's preliminary and tentative opinion that Pinata had $130,451.00 more net income as a result of the cracked frame property loss that Pinata would have earned if no cracked frame property loss had occurred.  It was Meaden & Moore's preliminary and tentative opinion that Pinata had a loss of business income in the amount of $18,220.00 as a result of the fire loss.

**ANSWER:**    AMCO states that the June 8, 2007 Meaden & Moore report is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 64 to the extent that they are inconsistent with or give an inaccurate portrayal of said report.

65.    On or about October 2, 2007, Pinata submitted its revised claim for loss of business income and extra expense caused by the fire loss, calculated through April 30, 2007, when the fire damage was finally repaired.  Pinata submitted a claim for loss of business income and extra expense in the total amount of $1,546,503 caused by the fire loss.

**ANSWER:**    AMCO admits that on or about October 2, 2007, Pinata's attorney wrote to Hartford's claim representative regarding Meaden & Moore's June 8, 2007 report.  AMCO  states that the October 2, 2007 letter is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 65 to the extent that they are inconsistent with or give an inaccurate portrayal of said letter.

66.     On or about October 24, 2007, Meaden & Moore produced its analysis of Pinata's revised claim entitled: *Pinata Graphics – Incidents of 11/24/05 and 7/22/06 – Claimed v. Calculated by Category and Incident*.

**ANSWER:**     AMCO admits the allegations contained in paragraph 66.

67.     It was Meaden & Moore's written opinion that Pinata earned $130,451 more in net business income because of the cracked frame property loss, than Pinata would have earned if no cracked frame property loss had occurred.

**ANSWER:**     AMCO states that the October 24, 2007 Meaden & Moore report is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 67 to the extent that they are inconsistent with or give an inaccurate portrayal of said report.

68.     It was Meaden & Moore's written opinion that Pinata earned $195,166 more in net business income because of the fire loss, than Pinata would have earned if no fire loss had occurred.

**ANSWER:**     AMCO states that the October 24, 2007 Meaden & Moore report is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 68 to the extent that they are inconsistent with or give an inaccurate portrayal of said report.

69.     The parties continued to negotiate a resolution of Pinata's claim for loss of business income and extra expense.  On or about November 26, 2007, the parties negotiated a settlement of Pinata's claim for loss of business income and extra expense caused by the cracked frame property loss.  In consideration of the payment of certain sums, Pinata and Perez released Hartford, AMCO, Nationwide and Allied from any and all claims resulting from the cracked frame property loss, while reserving any and all claims for damage caused by the fire loss.

**ANSWER:**    AMCO admits that on November 6, 2007, a Settlement Agreement and Release was entered into between Hartford, AMCO, Pinata, and Mr. Perez. AMCO states that the Settlement Agreement and Release is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 69 to the extent that they are inconsistent with or give an inaccurate portrayal of said Settlement Agreement and Release.

70.    On or about November 26, 2007, AMCO and/or Nationwide and/or Allied agreed to retain a second accounting firm to examine Pinata's claim for loss of business income and extra expense caused by the fire loss.

**ANSWER:**    AMCO admits that on November 20, 2007 it referred the matter to second forensic accounting firm, Walworth and Nayh, to examine Pinata's claim for loss of business income and extra expense caused by the fire loss, but denies that Nationwide or Allied did so.

71.    On or about December 21, 2007, AMCO and/or Nationwide and/or Allied wrote a letter to counsel for Pinata, informing Pinata that the second accounting firm had calculated Pinata's loss of business income and extra expense caused by the fire loss in the amount of $139,125.00.

**ANSWER:**    AMCO admits that on December 21, 2007, it sent a letter to counsel for Pinata outlining AMCO's position and what additional documentation that would be needed to potentially change that position. AMCO states that the December 21, 2007 letter is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 71 to the extent that they are inconsistent with or give an inaccurate portrayal of said letter.

72.    On or about December 21, 2007, AMCO and/or Nationwide and/or Allied tendered a check to Pinata in the amount of $12,125.00, which together with sums previously advanced,

brought to $139,125.00 the total amount paid by AMCO and/or Nationwide and/or Allied for Pinata's loss of business income and extra expense caused by the fire.

**ANSWER:**    AMCO admits that on January 24, 2008, it issued a check to Pinata in the amount of $12,125.00 for the business income claim in connection with the fire loss, but denies that Nationwide or Allied did the same.  AMCO denies that the total amount it paid for Pinata's loss of business income and extra expense caused by the fire was $139,125.

73.    By correspondence dated December 21, 2007, AMCO and/or Nationwide and/or Allied refused further payment to Pinata for loss of business income and extra expense, on the basis of the claim documents submitted.

**ANSWER:**    AMCO states that the December 21, 2007 letter is in writing and speaks for itself, and therefore, denies the allegations contained in paragraph 73 to the extent that they are inconsistent with or give an inaccurate portrayal of said letter.

## PINATA GRAPHICS DISSOLVES

74.    On or about April 26, 2007, Pinata Graphics, Inc. assigned to Victor Perez all of its right, title and interest in and to its claim against AMCO, Nationwide, Allied and others.  A true copy of the assignment is attached as exhibit "3."

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 74 and, therefore, denies the same and demands strict proof thereof.  Answering further, AMCO admits that attached as Exhibit 3 to Plaintiffs' Complaint is a document entitled, "ASSIGNMENT OF PREMIER BUSINESS OWNERS INSURANCE POLICIES & CAUSES OF ACTION AGAINST THIRD PARTIES."  AMCO states that the document is in writing and speaks for itself, and therefore, denies the allegations contained in

paragraph 74 to the extent that they are inconsistent with or give an inaccurate portrayal of said document.

75.     Following execution of the written assignment, Pinata Graphics, Inc. voluntarily dissolved as a corporation.

**ANSWER:**    AMCO lacks knowledge or information sufficient to form a belief about the truth of the allegations contained in paragraph 75 and, therefore, denies the same and demands strict proof thereof.

**COUNT I**
**BREACH OF CONTRACT**

1-75.    Plaintiffs repeat and reallege paragraphs 1. through 75.

**ANSWER:**    AMCO repeats and realleges its Answers to paragraphs 1 through 75 as though fully set forth herein.

76.     Plaintiffs have performed all conditions precedent in recovery under the AMCO policy and AMCO renewal policy, or such conditions have been waived.

**ANSWER:**    To the extent the allegations contained in paragraph 76 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO denies the allegations contained in paragraph 76.

77.     AMCO is in breach of the contract of insurance, by its failure to pay the full amount of the loss of business income and extra expense incurred by Pinata as a result of the fire which occurred on July 22, 2006.

**ANSWER:**    To the extent the allegations contained in paragraph 77 state a legal conclusion, no answer is required.  To the extent that an answer is required, AMCO denies the allegations contained in paragraph 77.

78.    Pinata's actual loss of business income and extra expense incurred as a result of the fire loss of July 22, 2006, is in excess of $1,500,000.00.

**ANSWER:**    AMCO denies the allegations contained in paragraph 78.

79.    AMCO and/or Nationwide and/or Allied has paid only $139,125.00 for loss of business income and extra expense caused by the fire which occurred on or about July 22, 2006.

**ANSWER:**    AMCO denies the allegations contained in paragraph 33.

**COUNT II**
**NEGLIGENCE**

AMCO makes no answer to the allegations contained in Count II of Plaintiffs' Complaint as AMCO has filed a motion to dismiss Count II.

**COUNT III**

**VEXATIOUS AND UNREASONABLE DELAY**

AMCO makes no answer to the allegations contained in Count III of Plaintiffs' Complaint as AMCO has filed a motion to dismiss Count III.

WHEREFORE, the defendant, AMCO INSURANCE COMPANY, prays that this Court deny the relief requested by Plaintiffs in Count I of their Complaint, and grant judgment in favor of AMCO.

## DEFENSES

NOW COMES the defendant, AMCO INSURANCE COMPANY ("AMCO"), by and through its attorneys, John D. Hackett and Jamie L. Hull of CASSIDAY SCHADE LLP, and for its Defenses, affirmative and otherwise, to Count I of Plaintiffs' Complaint, states as follows:

### FIRST DEFENSE

Count I of Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

Count I of Plaintiffs' Complaint is barred in whole or in part by the doctrines of waiver, estoppel and/or laches.

### THIRD DEFENSE

Count I of Plaintiffs' Complaint is barred in whole or in party by the doctrine of account stated.

### FOURTH DEFENSE

Count I of Plaintiffs' Complaint is barred in whole or in part by the doctrines of payment, release, ratification, and/or accord and satisfaction.

### FIFTH DEFENSE

Count I of Plaintiff's Complaint is barred in whole or in party by the November 26, 2007 Settlement Agreement & Release.

### SIXTH DEFENSE

Count I of Plaintiffs' Complaint is barred in whole or in part by the terms, conditions, exclusions and limitations contained in the AMCO policies, including but not limited to, the Duties In The Event Of Loss Or Damage clause and the Legal Action Against Us clause.

29

## SEVENTH DEFENSE

Additional information and documentation was reasonably requested from Pinata and Mr. Perez necessary for the evaluation of Pinata and Mr. Perez's claims for business income and extra expense loss, but Pinata and Mr. Perez failed to provide this additional information and documentation.

## EIGHTH DEFENSE

Count I of Plaintiffs' Complaint is barred in whole or in part by Pinata and Mr. Perez's failure to mitigate damages.

## NINTH DEFENSE

Count I of Plaintiffs' Complaint is barred in whole or in part by Plaintiffs' inability to recover in both his individual capacity and as an assignee.

## TENTH DEFENSE

Count I of Plaintiffs' Complaint does not describe the claims made against AMCO with sufficient particularity to enable AMCO to determine all defenses (including defenses based upon the terms, conditions or exclusions of the AMCO policies) it has to this suit. AMCO, therefore, reserves its right to assert all additional defenses that may be pertinent to Plaintiffs' Complaint once the precise nature of each claim is ascertained through discovery and investigation.

WHEREFORE, the defendant, AMCO INSURANCE COMPANY, prays that this Court deny the relief requested by Plaintiffs in Count I of their Complaint, and grant judgment in favor of AMCO.

Dated:  August 7, 2008

Respectfully submitted,


By:    s/ Jamie L. Hull
       John D. Hackett
       Jamie L. Hull
       Attorneys for Defendants
       CASSIDAY SCHADE LLP
       20 N. Wacker Dr., Suite 1040
       Chicago, Illinois 60606
       (312) 641-3100
       ARDC #6273814

7146929